## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

JAMES STEPHENS,                          :

           Plaintiff,           :

                                     Case No. 3:10CV0295

 vs.                                      :

                                     District Judge Walter Herbert Rice

MICHAEL J. ASTRUE,                       :     Magistrate Judge Sharon L. Ovington
     Commissioner of the Social
     Security Administration,           :

           Defendant.           :

## REPORT AND RECOMMENDATIONS[1]

### I.    <u>Introduction</u>

Plaintiff James Stephens sought financial assistance from the Social

Security Administration by applying for Disability Insurance Benefits ["DIB"] in

December 2005, alleging disability since August 1, 2004. (Tr. 65-67). He claimed

to be disabled by chronic disc disease, bilateral plantar facia, high cholesterol,

and depression. (Tr. 74).

After various administrative proceedings, Administrative Law Judge

["ALJ"] Thaddeus J. Armstead, Sr. denied Plaintiff's DIB application based on his

---

[1]Attached hereto is NOTICE to the parties regarding objections to this Report and
Recommendations.

conclusion that Plaintiff's impairments did not constitute a "disability" within the meaning of the Social Security Act. (Tr. 26-40). The ALJ's nondisability determination and the resulting denial of benefits later became the final decision of the Social Security Administration. Such final decisions are subject to judicial review, *see* 42 U.S.C. § 405(g), which Plaintiff now is due.

This case is before the Court upon Plaintiff's Statement of Errors (Doc. #10), the Commissioner's Memorandum in Opposition (Doc. #13) , the administrative record, and the record as a whole.

Plaintiff seeks a reversal of the ALJ's decision and remand for payment of benefits. At minimum, Plaintiff seeks a remand of this case to the Social Security Administration to correct certain claimed errors. The Commissioner seeks an Order affirming the ALJ's decision.

## II.   Background

### A.   Plaintiff's Vocational Profile and Testimony

Plaintiff was 46 years old on the alleged disability onset date, but turned 50 years old in 2007. He thus is considered to be "closely approaching advanced age" for purposes of resolving his DIB claim. *See* 20 C.F.R. § 404.1563(d); (*see also* Tr. 38, 68). Plaintiff has a high-school education and completed "welding

school." (Tr. 80). He has worked as a setter for molding and core making machines. (Tr. 75, 85-86).

Plaintiff testified at the administrative hearing that he could not work due to severe back and foot pain and depression. (Tr. 652). He had tried physical therapy and injections, but neither helped. (Tr. 652-53). His pain management physician continued to prescribe pain medications and anti-inflammatory medications. (Tr. 653). He underwent one surgery on his feet and an ultrasound procedure, but these did not resolve his foot problems. (Tr. 655). Plaintiff testified that Dr. Pema, his podiatrist, informed him that he could have surgery again on his foot, but there was "no guarantee" that the surgery would alleviate his pain. (*Id.*).

Plaintiff estimated that he could stand for "maybe" 10 minutes before needing to sit due to pain in his feet. (Tr. 656). He could not lift more than 10 pounds because of his back pain, and found it difficult to bend and stoop. (Tr. 654).

Plaintiff also testified about his depression (Tr. 652), noting that he had been depressed for the prior three years. (Tr. 657). He believed that the notion of his pain being permanent caused him to become depressed. (*Id.*). He felt sad, his

mind drifted, he had appetite problems and sleep difficulty. (Tr. 656). He stated, "I just feel bad all the time." (*Id*.).

As to his daily activities, Plaintiff testified that he got out of his home once or twice a week to go grocery shopping with his fiancée. (Tr. 657). He was able to drive, and drove to the hearing. He did not perform household chores, as his fiancée did them. (Tr. 658).

**B.    Medical Opinions**

*1.    Physical Impairments*

Plaintiff relies on the opinions of Laila I. Gomaa, M.D., his treating pain management specialist; Shital Pema, D.P.M., his treating podiatrist; and Dong S. Moon, M.D., his treating psychiatrist.

Plaintiff treated with Dr. Gomaa from November 2005 through January 2009. (Tr. 285-405, 564-94, 628-35). In May 2008, a chiropractor in Dr. Gomaa's office, Dr. Goodwin, noted that Plaintiff was restricted to no lifting any weight over 20 pounds, and only occasionally lifting up to 10 pounds and frequently lifting up to five pounds. Plaintiff needed to alternate his position frequently with no prolonged sitting, and limited standing and walking. Plaintiff should

avoid bending at the waist, twisting, pushing/pulling, and climbing stairs.  (Tr. 589-91).[2]

In January 2009, Dr. Gomaa completed interrogatories in which she opined that a work environment would aggravate Plaintiff's symptoms such that his performance would decompensate and his current condition would worsen.  (Tr. 628-35).  She noted that Plaintiff had good days and bad days but would be unable to maintain gainful employment.  Dr. Gomaa indicated that Plaintiff could work for only two hours in an eight-hour day due to an aggravation of his symptoms.  (Tr. 630).  Dr. Gomaa opined that Plaintiff could lift 10 pounds occasionally and five pounds frequently, based on his reduced range of motion, muscle spasm, and MRI findings.  Dr. Gomaa also opined that standing, walking and sitting were limited to two hours total in an eight hour workday, for 20 minutes or less at a time.  Dr. Gomaa reported that Plaintiff would need to change positions frequently, and concluded that Plaintiff never should climb, balance, stoop, or crouch, and only occasionally could kneel or crawl.  (Tr. 632).

Plaintiff initially treated with podiatrist Dr. Pema in April 2002, for surgery due to plantar fasciitis.  (Tr. 140-41, 248-49).  When seen again in December 2005, Plaintiff reported constant pain with all activities.  Examination revealed pain

---

[2]In both parties' briefs and the ALJ's decision, Dr. Goodwin's May 2008 opinion mistakenly is attributed to Dr. Gomaa.  (*See* Tr. 37; Doc. #10 at 5, 13; Doc. # 13 at 10-13).

with palpation of the plantar fascial attachment to the calcaneus, a supinated gait, and a positive hallux dorsiflexion test with pain along the plantar fascial medial band.  Dr. Pema diagnosed proximal plantar fasciitis and calcaneal stress syndrome with micro tears of the proximal plantar fascia.  (Tr. 228).  In December 2006, Dr. Pema indicated that a repeat plantar fascial release surgery might be required.  (Tr. 225).  In 2008, Dr. Pema recommended an AFO (brace), but the brace was not covered by insurance.  (Tr. 557, 560-62).  Plaintiff's symptoms remained relatively unchanged and he continued to report difficulty with weight bearing for more than 20 minutes.  (Tr. 560).

In January 2009, Dr. Pema reported that Plaintiff had chronic severe high-grade constant bilateral heel pain.  (Tr. 595-97).  Treatment had included rest, physical therapy, pain medications, heel cushions, multiple corticosteroid injections, shoe modifications, night splinting and custom foot orthosis as well as a remote surgical treatment.  An extracorporeal shock wave therapy was tried on the right foot in November 2002.  (Tr. 595).  Dr. Pema reported that Plaintiff experienced palpable focalized tenderness to insertion of the planter medial tubercle of the bilateral calcaneus.  (Tr. 596).  Dr. Pema opined that Plaintiff had an inability to ambulate effectively on a sustained basis.  Dr. Pema recommended a revisional-surgical release of the plantar fascia.  Dr. Pema concluded that

Plaintiff's chronic problems led to difficulty wearing ankle foot orthosis, standing, and walking, limiting Plaintiff to "a sedentary life style."  (Tr. 597).

A medical expert, William Newman, M.D., testified by telephone as the medical expert at the administrative hearing.  Based on his review of the record, Dr. Newman testified that Plaintiff probably could be on his feet for up to four hours a day with arch supports to take the tension off the plantar fascia.  (Tr. 672).  Dr. Newman indicated that plantar fasciitis was "very common," typically healed in "a few months," and was not as severe as a broken bone.  (Tr. 674, 681). Dr. Newman did not agree with severe restrictions imposed by Plaintiff's treating physicians, based on the objective evidence, pathology, and Plaintiff's symptoms. (Tr. 675, 684).  Dr. Newman also testified that Plaintiff "could do better" than the lifting limitation of five to 10 pounds identified by the treating pain specialist. (Tr. 675).  Dr. Newman testified that the record did not support Plaintiff's behavior at the hearing, which included twisting, turning, leaning over, and grimacing in pain while sitting.  (Tr. 676-77).

Dr. Newman opined that Plaintiff could lift 20 pounds occasionally and 10 pounds frequently.  Dr. Newman noted that bending was restricted because Plaintiff was overweight.  (Tr. 678).  Dr. Newman testified that stooping and

7

crawling would be limited to one-third of the day, as would crouching and kneeling.  (Tr. 686-87).

      2.    *Mental Impairments*

     Plaintiff received mental health treatment from Dong S. Moon, M.D., a psychiatrist, and Audrey Berlin, MS, LPC, a therapist in Dr. Moon's office, from November 14, 2007 to at least December 2008.  (Tr. 274-84, 490-539, 598-627).  Initially, Plaintiff reported being depressed after his injury because he no longer could do things he used to do.  (Tr. 277-82).  Plaintiff noted that when his pain level increased, his depressive symptoms and irritability increased.  (Tr. 283).  Dr. Moon initially performed a psychiatric evaluation and noted that Plaintiff's mood was depressed and sad.  He appeared sad, subdued and withdrawn.  His speech and thought processes were coherent and relevant.  (Tr. 280).  Plaintiff had no suicidal ideation, was oriented, and appeared to be of average intelligence.  Plaintiff scored 27 out of 30 on a mini mental status examination ["MMSE"].  (Tr. 280).  Dr. Moon identified Plaintiff's diagnosis as a depressive disorder not otherwise specified and recommended medication management and individual counseling.  (Tr. 284).

     Plaintiff underwent counseling and was prescribed medication.  On January 4, 2008, Dr. Moon noted that Plaintiff still was depressed and frustrated

but now was calmer and slept better.  (Tr. 538).  In March 2008, Ms. Berlin noted that Plaintiff continued to be severely depressed.  (Tr. 528).  In April 2008, Plaintiff still was feeling depressed and frustrated because of his pain and physical limitations, but "[p]erhaps he sleeps a little bit better" on Ambien.  His condition was noted to be "slightly improving."  (Tr. 523).  In May 2008, Dr. Moon termed Plaintiff's condition about the same.  He appeared to be anxious, sad, and depressed with a constricted range of affect.  (Tr. 519).  On June 6, 2008, Plaintiff felt slightly better in mood when seen by Dr. Moon, but continued to feel frustrated with his pain and limitations.  Dr. Moon noted that Plaintiff appeared to be somewhat anxious and tense and in obvious physical distress.  (Tr. 506).  On June 30, 2008, Dr. Moon felt that Plaintiff's condition was improving, "particularly with his motivation."  (Tr. 504).  In August 2008, Plaintiff reported that he had been feeling "fairly well," and Dr. Moon again noted that Plaintiff's condition was improving.  (Tr. 496).

In September 2008, Dr. Moon noted that Plaintiff continued to be anxious, tense, subdued, and withdrawn, with a bland affect.  His motivation was somewhat improved.  (Tr. 624).  However, his energy level and motivation varied, and Ms. Berlin noted that he remained depressed more often than not.  (Tr. 622).  Plaintiff continued to report difficulty accepting his limitations and

9

pain.  (Tr. 617).  In October 2008, Dr. Moon reported some improvement, but noted that Plaintiff's energy and motivation fluctuated with his pain level. "Plaintiff is learning to pace his activity level as when his activity level goes up, his pain level increases.  This in turn increases his symptoms of depression and subsequent chronic pain making it harder for him to cope."  (Tr. 610).  In November 2008, Dr. Moon and Ms. Berlin rated Plaintiff's depression as "improving," noting that he now was "moderately depressed."  (Tr. 606).

On January 12, 2009, Dr. Moon reported that Plaintiff suffered from a depressive disorder and had a GAF of 50.[3]  (Tr. 636).  Dr. Moon opined that the combination of Plaintiff's pain and depression impaired his ability to function in the work place.  "It has become a vicious cycle.  Pain causes depression and then depression makes it harder to cope with the pain.  Pain also increases his irritability, which decreases his ability to cope with stress.  The sum of chronic pain and depression are greater than if each were taken independently."  (Tr. 637).  Dr. Moon also opined that Plaintiff likely would miss work more than three

---

[3]Mental health clinicians perform a Global Assessment of Functioning ["GAF"] to determine a person's psychological, social, and occupational functioning on a hypothetical continuum of mental illness.  It is, in general, a snapshot of a person's "overall level of functioning" at or near the time of the evaluation.  *See Hash v. Comm'r of Soc. Sec.*, 309 F. App'x 981, 988 n.1 (6th Cir. 2009); *see also* American Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 30 (4th ed. text rev. 2000).  A GAF of 50 indicates "serious symptoms such as . . . serious impairments in social, occupational, or school functioning."  *Id.* at 34,

10

times a month due to his impairments.  Dr. Moon concluded that Plaintiff

experienced a marked restriction of activities of daily living; marked difficulties

in maintaining social functioning; and marked deficiencies of concentration,

persistence or pace.  (Tr. 638).

In March 2006, Craig Olson, Ph.D., examined Plaintiff at the request of the

Ohio Bureau of Disability Determination ["BDD"].  (Tr. 191-95).  Dr. Olson

reported that Plaintiff's affect was flat and his mood was "somewhat depressed,

down, and sorry for himself."  (Tr. 193).  Plaintiff described his mood as all right

"[ex]cept when things start hurting me, I'm not as completely focused as I should

be."  (*Id*.).  Dr. Olson diagnosed a pain disorder associated with psychological

factors and a general medical condition, and an adjustment disorder with

depressed mood.  (Tr. 194).  Dr. Olson assigned a GAF of 61.[4]  (Tr. 195).  Dr.

Olson opined that Plaintiff had no impairment in his ability to understand,

remember, and follow instructions; mild impairment in his ability to relate to

others; mild to fair impairment in his ability to maintain attention, concentration,

persistence, and pace to perform simple repetitive tasks; and mild impairment in

---

[4]A GAF score of 61-70 indicates that a person has only mild symptoms or some difficulty with social, occupational or school functioning, but generally can function fairly well and have some meaningful interpersonal relationships.  American Psychiatric Ass'n, Diagnostic & Statistical Manual of Mental Disorders 34 (4th ed. text rev. 2000).

his ability to withstand the stress and pressure associated with day-to-day work activity.  (*Id*.).

## III.  **Administrative Review**

### A.  **"Disability" Defined**

The Social Security Administration provides DIB to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York*, 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 423(a)(1)(D).  The term "disability" – as defined by the Social Security Act – has specialized meaning of limited scope. It encompasses only those who suffer from a medically determinable physical or mental impairment severe enough to prevent them from engaging in substantial gainful activity.  *See* 42 U.S.C. § 423(d)(1)(A); *see also Bowen*, 476 U.S. at 469-70.  A DIB applicant bears the ultimate burden of establishing that he or she is under a "disability."  *Key v. Callahan*, 109 F.3d 270, 274 (6th Cir. 1997); *see Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992); *see also Hephner v. Mathews*, 574 F.2d 359, 361 (6th Cir. 1978).

The term "disability" as defined by the Social Security Act carries a specialized meaning of limited scope.  Narrowed to its statutory meaning, a "disability" includes only physical or mental impairments that are "medically determinable" and severe enough to prevent the claimant from (1) performing

12

his or her past job, and (2) engaging in "substantial gainful activity" that is

available in the regional or national economies.  *See Bowen*, 476 U.S. at 469-70.

### B.  <u>Social Security Regulations</u>

Administrative regulations require ALJs to resolve a disability claim

through a five-Step sequential evaluation of the evidence.  *See* 20 C.F.R. §

404.1520(a)(4); ( *see also* Tr. 26-28).  Although a dispositive finding at any Step

terminates the ALJ's review, *see Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007),

the complete sequential review answers five questions:

1.  Has the claimant engaged in substantial gainful activity?

2.  Does the claimant suffer from one or more severe impairments?

3.  Do the claimant's severe impairments, alone or in combination, meet or equal the criteria of an impairment set forth in the Commissioner's Listing of Impairments ["the Listings"], 20 C.F.R. Subpart P, Appendix 1?

4.  Considering the claimant's residual functional capacity,[5] can he perform his past relevant work?

5.  Considering the claimant's age, education, past work experience, and residual functional

_____

[5]The claimant's "residual functional capacity" is an assessment of the most the claimant can do in a work setting despite his or her physical or mental limitations.  20 C.F.R. § 404.1545(a); *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002).

> capacity, can he or she perform other work
> available in the national economy?

*See* 20 C.F.R. § 404.1520(a)(4); *see also Colvin*, 475 F.3d at 730; *Foster v. Halter*, 279

F.3d 348, 354 (6ᵗʰ Cir. 2001).

 **C.**  **ALJ Armstead's Decision**

 ALJ Armstead's pertinent findings began at Step 2 of the sequential

evaluation, where he concluded that Plaintiff had the severe impairments of

depressive disorder; bilateral posterior tibia tendonitis; plantar fasciitis with

minimal objective pathology; obesity; and degenerative disc disease of the

lumbar and cervical spines.  (Tr. 28).

 The ALJ concluded at Step 3 that Plaintiff did not have an impairment or

combination of impairments that met or equaled one in the Listings.  (Tr. 29).

 At Step 4, ALJ Armstead concluded that Plaintiff had the residual

functional capacity to perform light work[6] limited as follows: lifting 20 pounds

occasionally and 10 pounds frequently; should not stand or walk more than a

combined total of four hours during an eight-hour workday, with a sit-stand

option for the hours sitting; should not climb ladders, ropes, or scaffolds; but

may kneel, crawl, crouch, stoop, climb ramps and stairs, and perform overhead

---

  [6]The Regulations define light work as involving the ability to lift "no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds . . ."  20 C.F.R. § 404.1567(b).

reaching no more than one-third of an eight-hour day.  (Tr. 33).  The ALJ further

found that Plaintiff's mental impairments limited him to performing jobs that do

not involve production quotas or fast pace.  (*Id.*).  The ALJ concluded at Step 4

that Plaintiff was unable to perform his past relevant work as a job setter.  (Tr.

38).

At Step 5, considering Plaintiff's age, education, work experience, and

residual functional capacity, the ALJ concluded that jobs exist in significant

numbers in the national economy that Plaintiff can perform.  (Tr. 39).  The ALJ's

findings throughout his sequential evaluation led him ultimately to conclude that

Plaintiff was not under a disability and therefore was not eligible for DIB.  (Tr.

40).

## IV.  **Judicial Review**

Judicial review of an ALJ's decision proceeds along two lines: "whether the

ALJ applied the correct legal standards and whether the findings of the ALJ are

supported by substantial evidence."  *Blakley v. Comm'r. of Soc. Sec.*, 581 F.3d 399,

406 (6th Cir. 2009); *see Bowen v. Comm'r. of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir.

2007).

Review for substantial evidence is not driven by whether the Court agrees

or disagrees with the ALJ's factual findings or by whether the administrative

record contains evidence contrary to those factual findings. *Rogers v. Comm'r. of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met – that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance . . ." *Rogers*, 486 F.3d at 241.

The second line of judicial inquiry, reviewing for correctness the ALJ's legal criteria, may result in reversal even if the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r. of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part *Bowen*, 478 F.3d at 746. and citing *Wilson v. Comm'r. of Soc. Sec.*, 378 F.3d 541, 546-47 (6th Cir. 2004)).

**V.** **Discussion**

**A.** **The Parties' Contentions**

16

Plaintiff raises three allegations of error in this case.  (*See* Doc. #10 at 1). First, Plaintiff contends that the ALJ erred in assessing Plaintiff's physical residual functional capacity by giving great weight to the opinion of Dr. Newman, the medical expert, to the exclusion of treating pain specialist Dr. Gomaa's opinion, which was not considered in accordance with the applicable Rules and Regulations.  (*Id.* at 13-16).  Second, Plaintiff argues that he is more mentally limited than found by the ALJ.  (*Id.* at 16).  Specifically, Plaintiff contends that the ALJ improperly rejected the opinion of treating psychiatrist Dr. Moon in the absence of any other medical source to support the ALJ's interpretation of the mental health record after 2006.  (*Id.* at 16-18).  Third, Plaintiff argues that the ALJ failed to consider the effect of Plaintiff's depression on his pain.  (*Id.* at 19-20).

Opposing Plaintiff's allegations, the Commissioner maintains that the ALJ's RFC finding was reasonable and supported by substantial evidence as to both Plaintiff's physical and mental limitations (Doc. #13 at 9-16), and that the ALJ properly evaluated the interaction between Plaintiff's pain and depression. (*Id.* at 16-17).

### B.  **Medical Source Opinions**

*1.    Treating Medical Sources*

17

The treating physician rule, when applicable, requires an ALJ to place controlling weight on a treating physician's or treating psychologist's opinion rather than favoring the opinion of a nonexamining medical advisor, a one-time examining physician or psychologist, or a medical advisor who testified before the ALJ.  *Blakley,* 581 F.3d at 406; *see Wilson,* 378 F.3d at 544.  A treating physician's opinion is given controlling weight only if it is both well supported by medically acceptable data and not inconsistent with other substantial evidence of record.  *Id.*

"If the ALJ does not accord controlling weight to a treating physician, the ALJ must still determine how much weight is appropriate by considering a number of factors, including the length of the treatment relationship and the frequency of the examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and any specialization of the treating physician."  *Blakley,* 581 F.3d at 406 (citing *Wilson*, 378 F.3d at 544).

More weight generally is given to the opinions of examining medical sources than is given to the opinions of non-examining medical sources.  *See* 20 C.F.R. § 404.1527(d)(1).  Yet the opinions of non-examining state agency medical

consultants have some value and can, under some circumstances, be given significant weight. *See infra.*

      2.    *Non-Treating Medical Sources*

The Commissioner views non-treating medical sources "as highly qualified physicians and psychologists who are experts in the evaluation of the medical issues in disability claims under the [Social Security] Act." Social Security Ruling 96-6p, 1996 WL 374180, at *2. Yet the Regulations do not permit an ALJ to automatically accept (or reject) the opinions of a non-treating medical source. *See id.*, at **2-3. The Regulations explain that "[i]n deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive." 20 C.F.R. § 404.1527(b). To fulfill this promise, the Regulations require ALJs to evaluate non-treating medical source opinions under the factors set forth in § 404.1527(d), including, at a minium, the factors of supportability, consistency, and specialization. *See* 20 C.F.R. § 404.1527(f); *see also* Ruling 96-6p at **2-3.

    **C.**    <u>**Analysis**</u>

The ALJ declined to grant controlling or even significant weight to psychiatrist Dr. Moon's opinions. (*See* Tr. 37-38). The ALJ found it reasonable to expect that if Plaintiff truly were as functionally limited as reported by Dr. Moon,

he would require "more intense treatment, such as inpatient hospitalization," rather than just medication and counseling sessions every two weeks.  (Tr. 38). Further, the ALJ characterized Dr. Moon's and Ms. Berlin's opinions and observations as consisting primarily of a summary of Plaintiff's subjective complaints, which the ALJ found not to be credible.  (*Id.*).  The ALJ therefore felt that Dr. Moon's disability opinion was not supported by clinical observations or opinions contained in his and Ms. Berlin's treatment notes and records.  (Tr. 35).

The ALJ's reasons for rejecting Dr. Moon's opinions lack substantial evidentiary support for several reasons.  First, the ALJ overlooks that Dr. Moon's and Ms. Berlin's records identify many symptoms indicative of depression, including irritability, anxiety, tension, subdued/bland affect, withdrawal, and sleep difficulty.  (*See* Tr. 274-84, 490-539, 598-627).  When mental work abilities are at issue, such symptoms constitute supporting medical or objective evidence. As the United States Court of Appeals for the Sixth Circuit has explained:

> In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices . . . in order to obtain objective clinical manifestations of mental illness . . . [W]hen mental illness is the basis of a disability claim, clinical and laboratory data may consist of the diagnosis and observations of professionals trained in the field of psychopathology.  The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or

20

> the absence of substantial documentation, unless there
> are other reasons to question the diagnostic techniques.

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting, *inter alia, Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)).  In Plaintiff's case, the ALJ identified no reason to question Dr. Moon's diagnostic techniques.  (*See* Tr. 35, 37-38).  Accordingly, the ALJ erred by rejecting Dr. Moon's opinions based on their reliance on clinical observations.

That error is compounded by the absence of a medical source opinion supporting the ALJ's analysis of Dr. Moon's opinions.  Indeed, the record is devoid of any medical source opinion contrary to Dr. Moon's opinion after 2006. Instead, the ALJ injected his own lay opinion about the lack of significance of Plaintiff's symptoms of depression identified in Dr. Moon's records.  "[A]n ALJ must not substitute his own judgment for a physician's opinion without relying on other evidence or authority in the record."  *Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000); *see also Meece v. Barnhart*, 192 F. App'x 456, 465 (6th Cir. 2006) ("the ALJ may not substitute his own medical judgment for that of the treating physician where the opinion of the treating physician is supported by the medical evidence); *Rosa v. Callahan*, 168 F.3d 72, 79 (2nd Cir. 1999); *Hamlin v. Barnhart*, 365 F.3d 1208, 1217-18 (10th Cir. 2004).

The only medical source opinion on which the ALJ relied to support his

assessment of Plaintiff's mental work abilities was that of Dr. Olson, the one-time examiner for the Ohio BDD.  (*See* Tr. 30, 31-32).  Dr. Olson's March 2006 report, however, predates Plaintiff's treatment and therapy with Dr. Moon and Ms. Berlin.  Dr. Olson's report thus does not address Plaintiff's mental work abilities after the spring of 2006, prior to treatment with Dr. Moon.  This leaves Dr. Moon's opinions about Plaintiff's work abilities after 2007 uncontradicted by any medical source opinion.

The ALJ also did not address Dr. Moon's opinion that Plaintiff's symptoms of depression impeded his ability to cope with his physical pain.  Dr. Moon indicated repeatedly that Plaintiff's pain likely would lead him to decompensate under work stress and deprive him of many mental work abilities.  (*See* Tr. 283, 506, 519, 610, 617, 626, 637).  Dr. Moon's report explains this in some detail, a consideration that the ALJ overlooked or ignored when rejecting this treating psychiatrist's opinions.  (*See id.*; *see* Tr. 34-35, 38).  By failing to consider this feature of Dr. Moon's report, the ALJ also failed to defer to the mandatory language regarding the "supportability" factor, which promises, "The better explanation a source provides for an opinion, the more weight we will give that opinion . . ."  20 C.F.R. § 404.1527(d)(3).  This omission was critical, because Dr. Moon's opinion was the only medical source opinion in the record addressing the

22

combined impact of Plaintiff's physical pain and depression on his work abilities after 2007.  *See* 42 U.S.C. § 423(d)(2)(B); *see also* 20 C.F.R. § 404.1523.

Plaintiff also challenges the ALJ's assessment of Plaintiff's RFC for physical work, due to his rejection of Dr. Gomaa's opinions.  (Doc. #10 at 12-16).  Fully addressing the parties' contentions regarding this aspect of the ALJ's decision is unnecessary, however, because the ALJ relied on the opinion of Dr. Newman, who testified at the hearing as a medical expert, without weighing that opinion subject to the requisite regulatory factors.   Instead, the ALJ merely stated that the RFC restrictions he set for Plaintiff "are consistent with the testimony of the medical expert who noted that the objective and clinical pathology was not consistent with the degree or pain or functional restrictions alleged by the claimant."  (Tr. 34).  Such reliance was contrary to the regulatory requirement that ALJs weigh the opinions of non-treating physicians – here, the medical expert – under at least the factors of supportability, consistency and specialization.  *See* 20 C.F.R. § 404.1527(d) (f)(iii); Social Security Ruling 96-6p, 1996 WL 374180, at *2.  In accepting Dr. Newman's opinion, ALJ Armstead made no mention of what regulatory factors – supportability, consistency, specialization – led him to credit that opinion.  By failing to do so, the ALJ did not apply the correct legal criteria to Dr. Newman's testimony.

23

Accordingly, for all the above reasons, Plaintiff's challenges to the ALJ's decision are well taken.

## VI.  <u>Remand Is Warranted</u>

If an ALJ failed to apply the correct legal standards or his factual conclusions are not supported by substantial evidence, the Court must decide whether to remand the case for rehearing or to reverse and order an award of benefits.  Under Sentence Four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing."  *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991).  Remand is appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding.  *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is unwarranted in the present case, because the evidence of disability is not overwhelming, nor is the evidence of a disability strong while contrary evidence is weak.  *See id.*  Plaintiff is entitled, however, to an order remanding this case to the Social Security Administration pursuant to Sentence Four of Section 405(g), due to the errors outlined above.  On remand, the ALJ should be directed (1) to re-evaluate the medical source opinions under

the legal criteria set forth in the Commissioner's Regulations, Rulings, and as required by case law; and (2) to reconsider, under the required sequential evaluation procedure, whether Plaintiff was under a disability prior to December 31, 2010, and thus was eligible for DIB.  Accordingly, the case should be remanded to the Commissioner and the ALJ for further proceedings consistent with this Report and Recommendations.

**IT THEREFORE IS RECOMMENDED THAT**:

1.    The Commissioner's non-disability finding be VACATED;

2.    No finding be made as to whether Plaintiff James Stephens was under a "disability" within the meaning of the Social Security Act;

3.    This case be REMANDED to the Commissioner and the Administrative Law Judge under Sentence Four of 42 U.S.C. § 405(g) for further consideration consistent with this Report; and

4.    The case be TERMINATED on the docket of this Court.

August 2, 2011                                              s/Sharon L. Ovington
                                                            Sharon L. Ovington
                                                    United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen [14] days after being served with this Report and Recommendations. Pursuant to Fed. R. Civ. P. 6(d), this period is extended to seventeen [17] days because this Report is being served by one of the methods of service listed in Fed. R. Civ. P. 5(b)(2)(C), (D), (E), or (F).  Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections.  If the Report and Recommendations are based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs.  A party may respond to another party's objections within fourteen [14] days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal.  *See Thomas v. Arn,* 474 U.S. 140 (1985), *United States v. Walters,* 638 F. 2d 947 (6th Cir. 1981).